IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| RICHARD ROSENTHAL,<br><br>        *Counterclaimant,*<br><br>v.<br><br>R. W. SMITH COMPANY,<br><br>        *Counterdefendant.* | CIVIL NO. 6:16-CV-00056<br><br><br>MEMORANDUM OPINION<br><br><br>JUDGE NORMAN K. MOON |

  The parties in this case entered into a contract related to the renovation of a Kroger store. R.W. Smith Company ("RWS") was the general contractor on the project, while Richard Rosenthal was the President of a plumbing subcontractor called M.E.P. Mechanical, Inc. ("MEP"). MEP employed subcontractors to provide labor for the Kroger project, but several of them did not get paid on time for their work. The essence of the dispute is which party bears responsibility for the non-payment of the labor subcontractors.

  Currently before the Court is a counterclaim by Rosenthal against RWS. Rosenthal claims that RWS falsely told the labor subcontractors that MEP had been paid fully for the subcontractors' work, thus leading the labor subcontractors to blame MEP rather than RWS for their lack of payment. Based on these facts, Rosenthal asserts claims for: (1) statutory business conspiracy, (2) common law business conspiracy, (3) defamation, (4) tortuous interference with a business expectancy, and (5) punitive damages. RWS has filed a motion to dismiss each of these counterclaims.

  Although the parties requested a hearing on this matter, the Court concludes that the parties' positions have been adequately conveyed in their briefings. In accordance with Local

Rule 11(c) and Federal Rule of Civil Procedure 78(b), the Court will decide RWS's motion without a hearing.

RWS's motion to dismiss Rosenthal's counterclaim will be granted in part and denied in part. The Court will grant RWS's motion as to the conspiracy and tortious interference claims. Rosenthal's conspiracy claims fail because a conspiracy cannot exist between agents working within a single corporate entity. Rosenthal's tortious interference claim will be dismissed because Rosenthal does not have any individual business expectancy with regard to any of the subcontractors at issue in this case. Punitive damages in the counterclaim are a remedy rather than a separate claim, and need not be addressed at the motion-to-dismiss stage. Finally, Rosenthal's defamation claim is adequately pled because he has alleged a sufficient nexus between himself and MEP such that he can bring suit for allegedly defamatory statements about MEP's conduct.

## I. Facts as Alleged

RWS entered into a subcontract purchase order agreement ("the Contract") with MEP for plumbing work on the Kroger project in Midlothian, Virginia. (Dkt. 31 ¶¶ 1, 2). Richard Rosenthal is the principal shareholder and president of MEP. (*Id.* ¶ 3). The Contract contained provisions allowing for change orders to amend the scope of the work and compensation. (*Id.* ¶ 4). MEP did not have sufficient labor to fulfill the work expectations of RWS, so it subcontracted for additional labor. (*Id.* ¶¶ 6, 7). RWS authorized change orders allowing MEP to employ this additional subcontract labor in order to meet RWS's work expectations. (*Id.* ¶ 7).

Although RWS assured MEP that it would continue to authorize and pay change orders to enable MEP to employ additional labor, RWS ceased payment for subcontract labor on April 21, 2016. (*Id.* ¶¶ 10–12). From that date until June 2016, MEP continued to employ subcontract labor and requested that RWS authorize and pay for such labor via change orders. (*Id.* ¶¶ 13–14).

In late June 2016, MEP could no longer afford to employ the subcontract labor for RWS at the Kroger project, and moved personnel to other projects. (*Id*. ¶ 18). As a result, RWS informed MEP that it would hire a replacement plumbing contractor to complete the project if MEP did not resume work pursuant to RWS's expectations. (*Id*. ¶ 19). MEP resumed work, but RWS nonetheless hired a replacement plumbing contractor. (*Id*. ¶¶ 20-21). The presence of the replacement plumbing contractor forced MEP to stop work on the Kroger project. (*Id*. ¶ 22). MEP continued to request compensation for the subcontract labor it employed from April through June 2016, but RWS refused to provide payment. (*Id*. ¶¶ 23–24).

After this souring of relations, Rosenthal alleges that RWS began to speak ill of MEP to MEP's subcontractors. (*Id*. ¶ 25). This "campaign to defame" is evidenced by several communications. (*Id*.). First, one of MEP's subcontractors, Kenneth Douglas of Tradesmen International, sent an email to RWS employee Kevin Jenny on May 13, 2016, stating:

> I am going to let my credit manager know of what is going on today and let you know the next step she wants to take. I am learning that this is not the first time that this has happened with Rick [Rosenthal] and also not the first company he has owned where the same pattern has been repeated.

(*Id*. ¶ 26). On May 17, he sent a follow up email:

> Kevin, We were supposed to meet Rick this morning to get payment and he is no where to be found. We have reached out to him and cannot get in touch with him. This needs to be resolved ASAP. What can you do to help before we take this next step.

(*Id*. ¶ 27).

The second communication occurred on July 11, 2016, when Richard Buleza of Construction Labor Contractors ("CLC") sent an email to Rosenthal that read as follows:

> Good Morning Rick, Please give my office a call today in order to let me know when I can meet you to pick a ck for the past due amount. *We have been told by Jamie Bates that you have already been paid for our invoices*. You are now

>$6,410.25 over 61 days and $12,309 past 31 days. This amount is way over your credit limit of $5,000 and we really [need] to get this paid timely . . .

(*Id*. ¶ 28 (emphasis in counterclaim)). Jamie Bates is an employee of RWS. (*Id*. ¶29).

Rosenthal believed the allegations in the CLC letter regarding the fact that RWS fully paid MEP were the product of false representations by RWS to CLC. (*Id*. ¶¶ 30-31). Thus, Rosenthal sent a certified letter to RWS on July 13th which stated:

> It has been brought to my attention that RW Smith Company is falsely making accusations that payment has been made in full to M.E.P. Mechanical, Inc. Under no circumstances is that statement true. I have taken serious notice of these completely false and scandalous accusations that render a distorted and fictional travesty of facts about M.E.P. Mechanical with the malicious purpose to defame and disgrace M.E.P. Mechanical, Inc. These false accusations are to stop immediately and any further allegations will no longer be tolerated. If RW Smith continues to make these remarks further legal action will be taken.

(*Id*. ¶ 32). Kevin Jenny responded on behalf of RWS:

> Please note that we have not stated that MEP Mechanical has been paid in full. What we have said is that MEP has been paid for the periods in which the labor from the labor vendors were utilized. Therfore [sic] the payment of the labor invoices are due from MEP Mechanical as has been previously demanded.

(*Id*. ¶ 33).

The fourth and final set of communications involved a separate project constructing a new Sam's Club (the "Sam's Club project") in Woodbridge, Virginia, in which MEP was a subcontractor to William A. Randolph, Inc. ("WAR"). (*Id*. ¶ 35). On August 3, Brian Gillespie of Gillman Services, Inc. — a subcontractor hired by MEP for the Kroger project — emailed Eric Handley at WAR to lodge the following complaint about MEP:[1]

---

[1] The counterclaim does not state whether Gillman was also a labor contractor on the Sam's Club project. From the context provided by the following email exchange, however, it appears that it was.

> I am one of the owners and I am responding to the money owed to us by MEP for provided labor. To date we are owed $112639.04 for that job. I have tried to contact Rick and have been given nothing but the run around….

(*Id*. ¶ 36). Soon after, Handley of WAR sent an email to Rosenthal stating:

> Rick, see below [indicating Gillespie's email]. It appears you are not a plumber but a con-man. You will be hearing from our lawyer in the very near future.

(*Id*. ¶ 37). Rosenthal responded by first contacting Gillespie, stating:

> Brian, I have seen the correspondence that you have sent William A. Randolph. You are giving them a completely false picture of the reality that Gillman Services is owed…. Until you are made aware fully of these allegations above, I would advise against making false statements to anyone concerning myself, MEP Mechanical, Inc. and our employees.

(*Id*. ¶ 38). Gillespie responded to Rosenthal's email with the following:

> Not only are you a liar and a fraud, you are the type of company that gives this country a bad name…. You send[*sic*] Kroger a letter after you been paid. You fooled me once, it won't happen twice….All lies, you might scam someone else but it won't be us.

(*Id*. ¶ 39). Gillespie sent another email to Rosenthal a half-hour later stating:

> I will not speak with you any further I am dealing directly with all GC and once that is settled we will legally and professionally deal with you. Do not contact us any further. Good luck.

(*Id*. ¶ 40). The last communication alleged with respect to the Sam's Club project is that Rosenthal emailed Handley to try to assure the general contractor that MEP had not engaged in wrongdoing, although the contents of this email are not alleged in the amended counterclaim. (*Id*. ¶ 41). As a result of the claims by Gillespie against MEP, MEP was removed by WAR from the Sam's Club project. (*Id*. ¶ 42).

## II. Standard of Review

When evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must accept as true all well-pleaded allegations. *See Vitol, S.A. v. Primerose Shipping Co.*, 708

5

F.3d 527, 539 (4th Cir. 2013); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and quotation marks omitted). Stated differently, in order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

### III. Discussion

#### a. Statutory and Common Law Business Conspiracy

Rosenthal asserts a claim of business conspiracy under two statutes: Code of Virginia §§ 18.2-499 and 18.2-500. Under § 18.2-499,

> Any two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever or (ii) willfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act, shall be jointly and severally guilty of a Class 1 misdemeanor.

Section 18.2-500 creates a cause of action for injured parties to sue for violations of § 18.2-499, stating: "Any person who shall be injured in his reputation, trade, business or profession by reason of a violation of § 18.2-499, may sue therefore and recover three-fold the damages to him sustained." Va. Code § 18.2-500. In order to recover on a claim of statutory business conspiracy, Rosenthal must show "(1) a combination of two or more persons for the purpose of willfully and maliciously injuring a plaintiff's business, and (2) resulting damage to the plaintiff." *Rogers v. Deane*, 992 F. Supp. 2d 621, 633 (E.D. Va.), *aff'd*, 594 F. App'x 768 (4th Cir. 2014).

6

The elements of common law business conspiracy under Virginia law are: "(i) an agreement between two or more persons, (ii) to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, which (iii) results in damage to plaintiff." *William v. AES Corp.*, 28 F. Supp. 3d 553, 574 (E.D. Va. 2014).

Rosenthal claims that the conspiracy here was the agreement between RWS employees to spread defamatory statements about MEP to its subcontractors. Specifically, Rosenthal alleges that RWS employees Jamie Bates and Kevin Jenny told several MEP subcontractors that MEP had already been fully paid for the subcontractors' services. The result of these allegedly false statements was that MEP's subcontractors blamed MEP for their lack of payment rather than RWS.

Rosenthal's statutory and common law business conspiracy claims will be addressed together because they share the same fatal flaw — the lack of a conspiracy. Rosenthal does not state a conspiracy because he does not allege an agreement between two or more persons. Rosenthal alleges that the two or more persons who conspired against him were RWS employees Bates and Jenny. (*See* dkt. 31 ¶¶ 50, 57, 58, 64). However, there cannot be a conspiracy between agents of a corporation operating within the scope of their duties. *See Fox v. Deese*, 234 Va. 412, 428 (1987) ("If the defendants were acting within the scope of their employment and, therefore, were agents of the City, then only one entity exists—the City. By definition, a single entity cannot conspire with itself."); *Bowman v. State Bank of Keysville*, 229 Va. 534, 540–41 (1985) ("Of course, there must be two persons to comprise a conspiracy, and a corporation, like an individual, cannot conspire with itself."); *Deane*, 992 F. Supp at 633 ("If a principal/agent or an employer/employee relationship exists between the parties, the parties are not separate entities.").

Instead, when agents are acting within the scope of their duties, there is only one entity acting — the principal itself.

Here, there is no allegation that Bates and Jenny were operating outside of the scope of their agency. Instead, the counterclaim makes quite clear that Bates and Jenny were acting as agents of RWS in conducting the purported conspiracy. (*See* dkt. 31 ¶ 60 ("Accordingly, multiple agents of Plaintiff/Counterclaim Defendant RWS combined together for the purpose of 'willfully and maliciously injuring' Rosenthal 'in his reputation, trade, business or profession,' in violation of Virginia Code §§ 18.2-499 and 18.2-500.'"); *id.* ¶ 64 ("The concerted action of agents of RWS, including Bates and Jenny, to publish false and defamatory statements about MEP and Rosenthal . . . caused severe and ongoing damage to Rosenthal personally in his reputation, as well as in his trade and business.")). Thus, RWS was the only entity undertaking the allegedly wrongful act of stating falsehoods about MEP. Because there cannot be a conspiracy between RWS and itself, Rosenthal does not state a claim for either statutory or common law business conspiracy.

### b. Defamation

Rosenthal alleges defamation on the basis of communications made by RWS to MEP's subcontractors stating that MEP had already been paid fully for the subcontractors' work. These statements, Rosenthal alleges, made it appear that MEP was stiffing the subcontractors for their services rather than reflecting the reality that RWS was the party that had failed to pay. Rosenthal seeks damages to compensate him for the resulting harm to his professional reputation and MEP's loss of a $50,000 contract from the Sam's Club project.

Under Virginia law, defamation by publication requires "(1) publication of (2) an actionable statement with (3) the requisite intent." *Schaecher v. Bouffault*, 290 Va. 83, 91 (2015).

An actionable statement must be both false and "defamatory," meaning that the statement "tend[s] so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Id.* at 91–92. Rosenthal must also show that RWS's communications were "of and concerning" himself, rather than just MEP. *Id.* As to intent, "[t]he plaintiff also must show that the defendant knew that the statement was false or, believing that the statement was true, lacked a reasonable basis for such belief, or acted negligently in failing to determine the facts on which the publication was based." *Hyland v. Raytheon Technical Services Co.*, 277 Va. 40, 46 (2009) (citations omitted). Summarizing these standards, Rosenthal must allege facts making it plausible that RWS published a statement that: (1) was false, (2) was of and concerning Rosenthal, (3) harmed Rosenthal's reputation, and (4) was knowingly or negligently false.

Turning to the first requirement summarized above, it is uncontested that RWS's statements are alleged to be false. Rosenthal's stated legal theory rests on the allegation that RWS informed MEP's subcontractors that MEP had been paid fully for the subcontractors' services by RWS, when in fact RWS had not paid MEP for several months. Further, it is not contested at this point that Rosenthal has alleged that the violation was knowing, thus pleading the requisite intent. Instead, the controversy revolves around whether RWS's statements were of and concerning Rosenthal and whether Rosenthal has adequately alleged some sort of harm as a result.

In evaluating whether RWS's statements were of and concerning Rosenthal, the Court must look at the actual communications alleged to be defamatory.[2] The first is a statement by

---

[2] Rosenthal alleges a communication by Kenneth Douglas to RWS regarding MEP's nonpayment. (Dkt. 31 ¶¶ 26, 27). However, at no point does Rosenthal allege that RWS told Douglas anything about MEP or Rosenthal. Further, Rosenthal's defamation claim explicitly

9

Richard Buleza of the subcontractor CLC in an email to Rosenthal letting him know that "We have been told by [RWS employee] Jamie Bates that you have already been paid for our invoices." The second comes from an email from RWS employee Kevin Jenny to Rosenthal stating: "What we have said is that MEP has been paid for periods in which the labor from labor vendors were utilized." The final communication is one from Gillespie, a subcontractor on the separate Sam's Club project, saying: "You send[*sic*] Kroger a letter after you been paid." Thus, Rosenthal alleges that (1) Bates communicated to at least one subcontractor that MEP had been fully paid, (2) Jenny described RWS's practice of telling subcontractors that MEP had been paid for their labor, and (3) some unnamed individual told Gillespie that MEP/Rosenthal had been fully paid for the Kroger project.[3]

Looking at the content of the statements, they directly concern MEP rather than Rosenthal as an individual. It was MEP that had a right to receive payment from RWS and an obligation to pay subcontractors, so RWS's statements regarding subcontractor payment must have been directed at MEP. However, while "owners generally cannot personally pursue an action for defamation of their corporation," corporate owners may sometimes proceed on their own behalf when there is a "sufficient nexus" between them and the business such that the allegations as to the business are also of and concerning the owner. *Schaecher*, 290 Va. at 100.

In *Schaecher*, the plaintiffs were Schaecher as an individual and her dog kennel business Happy Tails. They brought suit on behalf of both entities for statements made indicating that

---

references three other communications while failing to mention Douglas's. Thus, the Court need not address the Douglas communication here.

[3]    Rosenthal does not allege that any RWS agent actually told Gillespie about MEP's nonpayment. Thus, Gillespie's statement does not directly support a claim of defamation by RWS. The statement is relevant, however, to illustrate the effect of allegations of MEP's wrongdoing on Rosenthal's personal reputation, as discussed more below.

they were dishonest and violating land use laws in operating Happy Tails on the property in question. One alleged instance of defamation occurred via a statement that Schaecher's sister Mary, who was the on-site caretaker of the business, had split with her boyfriend and was experiencing financial difficulties. *Schaecher*, 290 Va. at 99–100. The court in *Schaecher* held that there was not a sufficient nexus between the statement regarding Mary and either Schaecher or Happy Tails itself to allow the two plaintiffs to bring a claim on the basis of the statement, even though Mary was an employee integral to the operations of Happy Tails. *Id*. at 100. Importantly, the holding in *Schaecher* was in large part based on the conclusion that the allegedly defamatory statement was "unrelated to the work" of either Schaecher or Happy Tails. *Id*. Although the *Schaecher* court ultimately dismissed Plaintiffs' defamation claims because it found they were not actionable, it never held that statements concerning Schaecher could not be acted upon by Happy Tails, or *vice versa*. *See id*. at 89 n.1 (stating that "defamation against an individual is not necessarily defamation against her business and *vice versa*")

In contrast, Rosenthal here has alleged a much more substantial nexus between statements regarding MEP and himself. Rosenthal's claim states that he is the "principal shareholder and president of [MEP]." (Dkt. 31 ¶ 3). The communications from subcontractors make clear that they held Rosenthal personally responsible for MEP's failure to pay. For instance, in an email addressed to Rosenthal, CLC states that "*you* have already been paid for our invoice." (*Id*. ¶ 28 (emphasis added)). Handley also called Rosenthal a "con-man" and Gillespie called Rosenthal "a liar and a fraud" based only on allegations of non-payment by MEP. (*Id*. ¶¶ 37, 39). After calling Rosenthal a liar and a fraud, Gillespie's email to Rosenthal went on to say that "*you* are the type of company that gives this country a bad name," again conflating Rosenthal with MEP. (*Id*. ¶ 39 (emphasis added)). At least one contractor also indicated that he

11

held Rosenthal personally responsible for the conduct of his past companies, stating: "I am learning that this is not the first time that this has happened with Rick and also not the first company he has owned where the same pattern has been repeated." (*Id.* ¶ 26). These communications demonstrate that there is a nexus between Rosenthal and MEP such that allegations of MEP's wrongdoing could amount to allegations of Rosenthal's personal wrongdoing. Therefore, at this stage of the litigation, the Court will conclude that the alleged defamation was sufficiently "of and concerning" Rosenthal to allow his claim to proceed.

As to the harm, Rosenthal claims harm on the basis of the loss of the contract on the Sam's Club project and damage to his professional reputation. It is clear that Rosenthal cannot recover for the loss of MEP's contract. *See Landmark Commc'ns, Inc. v. Macione*, 230 Va. 137, 140 (1985) (finding it "dispositive" that the plaintiff "showed no damages to himself, as opposed to those his corporation may have suffered"); *Schaecher*, 290 Va. at 100 ("Corporate owners generally cannot personally pursue an action for defamation of their corporation, because the corporate entity is itself the only person entitled to recover for injuries to its business, profits or property." (internal quotations omitted)). The harm from the lost contract was borne by MEP, not Rosenthal.

Rosenthal has, however, sufficiently stated a defamation claim based on injury to his personal professional reputation in the building industry.[4] Rosenthal specifically alleges personal damages to his reputation which must be accepted as true at this point in the litigation. (*See* dkt. 31 ¶ 71). Further, the reputational damages are not too speculative to state a claim. The fact that multiple business associates believed Rosenthal was intentionally withholding funds owed to

---

[4] *Macione* does not directly apply to bar recovery because the issue there was that the plaintiff failed to prove personal damages and did not assert a claim that would permit the Court to presume them. *See WJLA-TV v. Levin*, 264 Va. 140, 164 (2002) (differentiating *Macione*). Here, those factors do not apply.

them is sufficient to infer reputational damage. Such damages might affect his future ability to conduct business in the construction trade, regardless of whether he does so via the MEP corporate form. (*See id*. ¶ 26 ("I am learning that this is . . . not the first company he has owned where the same pattern has been repeated.")) Thus, Rosenthal has adequately pled harm on the theory that the statements caused damage to his personal business reputation.

In sum, Rosental has adequately alleged a defamation claim. His legal theory is that RWS intentionally mislead MEP's subcontractors into believing that MEP possessed the money to pay them, but refused to do so. His theory incorporates the assertion that the accusations against MEP were of and concerning himself as the President and operator of MEP and did damage to his personal reputation. Rosenthal supports this legal theory with factual assertions regarding the statements made about MEP and their connection to harm to his personal reputation. RWS's motion to dismiss this claim will be denied.

### c. Tortious Interference

Rosenthal asserts a claim of tortious interference with a business expectancy based on the fact that RWS made false statements about MEP which interfered with its business relationships with certain subcontractors. The elements of a claim for tortious interference with a business expectancy are "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985).

Rosenthal has failed to state a claim for tortuous interference with a business expectancy because he did not establish that he personally had a contractual relationship or business

expectancy with any of the subcontractors. Instead, his counterclaim is replete with references to MEP's contracts and business relationships with the subcontractors. In fact, Rosenthal admits that his only business expectancy is through MEP, stating that "Rosenthal, as a principal of MEP, also had a business relationship and expectancy with CLC and Gillman, among other subcontractors." (Dkt. 31 ¶ 75). Under Virginia law, an individual such as Rosenthal does not have standing to assert a tortuous interference claim on behalf of a separate corporation. *See Macione*, 230 Va. at 140 ("[A] corporation, as owner and operator of a business, is itself the only person entitled to recover for injuries to its business, profits, or property."); *Keepe v. Shell Oil Co.*, 220 Va. 587, 591 (1979) ("The Keepes argue that they have legal standing because, as stockholders of the corporation, they are actual owners of the business and all its assets . . . We reject this argument. The corporation is a legal person, separate and distinct from the persons who own it . . . ."); *Semida v. Rice*, 863 F.2d 1156, 1161 (4th Cir. 1988) ("While there was evidence that Haid deliberately interfered with the [corporation's] contract, his improper conduct gave no rise to a cause of action by [the individual]. Rather [the corporation] was the injured party, and it has not joined in this litigation."); *Mullins v. First Nat'l Exchange Bank*, 275 F.Supp. 712, 721 (W.D. Va. 1967) ("The rule is that an officer or a shareholder of a corporation, even if he is the sole shareholder, has no personal or individual right of action against third parties for a wrong or injury inflicted by those third parties upon the corporation"). On this ground, Rosenthal's claim must be dismissed.

### d. Punitive Damages

RWS seeks to dismiss Rosenthal's claim for punitive damages. However, whether Rosenthal is entitled to punitive damages is a remedies issue that the Court will decline to address at this stage of the litigation. *See Coogan-Golden v. Wal-Mart Stores E., LP*, No. 5:15-

CV-00054, 2017 WL 963235, at *1–2 (W.D. Va. Mar. 13, 2017); *Meeks v. Emiabata*, No. 7:14CV00534, 2015 WL 1636800, at *2 (W.D. Va. Apr. 13, 2015); *Charles v. Front Royal Volunteer Fire & Rescue Dep't, Inc.*, 21 F. Supp. 3d 620, 631 (W.D. Va. 2014); *Debord v. Grasham*, 2014 WL 3734320, at *1 (W.D.Va. July 28, 2014).

## IV. Conclusion

Rosenthal's conspiracy claims both fail because there can be no conspiracy between agents of a corporation acting within the scope of their duties. His tortious interference claim must be dismissed because he cannot personally pursue a claim based on MEP's business expectancy. As a procedural matter, Rosenthal's punitive damages claim will not be dismissed using a motion under Rule 12(b)(6). Finally, Rosenthal's defamation claim may proceed because he adequately pleads a nexus between himself and MEP such that the accusations against MEP could have defamed him. RWS's motion to dismiss Rosenthal's counterclaim will be denied with respect to defamation and punitive damages and granted with respect to the conspiracy and tortious interference claims. An appropriate Order will issue.

Entered this  3rd  day of May, 2017

_____
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE